1

2

3

4

5

6

7                           UNITED STATES DISTRICT COURT

8                           CENTRAL DISTRICT OF CALIFORNIA

9

10    ANNIE JAMERSON and MILLICENT    )    CASE NO. CV 13-02825 MMM (JCx)
      VAN DYKE,                       )
11                                    )
                  Plaintiffs,         )    ORDER GRANTING IN PART AND
12                                    )    DENYING IN PART DEFENDANT'S
            vs.                       )    MOTION TO DISMISS; GRANTING IN
13                                    )    PART AND DENYING IN PART
      UMG RECORDINGS, INC. and DOES   )    DEFENDANT-IN-INTERVENTION'S
14    1-10, inclusive,                )    MOTION TO DISMISS
                                      )
15                                    )
                  Defendants.         )
16    _____ )
      EDDIE WILLIS,                   )
17                                    )
                  Plaintiff-in-Intervention, )
18                                    )
            vs.                       )
19                                    )
      UMG RECORDINGS, INC. and DOES   )
20    1-10, inclusive,                )
                                      )
21                                    )
                  Defendants-in-Intervention. )
                                      )
22    _____ )

23

24          On April 22, 2013, Annie Jamerson and Millicent Van Dyke filed this action against

25    Universal Music Group, Inc. ("UMG").[1]  The action was transferred to this court on April 30,

26

27    _____

28          [1]Complaint, Docket No. 1 (Apr. 22, 2013).

2013 following the recusal of Judge Dean D. Pregerson on April 24, 2013.[2] Jamerson and Van Dyke filed a first amended complaint on July 29, 2013,[3] and a second amended complaint on January 8, 2014.[4] Also on January 8, 2014, plaintiff-in-intervention Eddie Willis filed a complaint against UMG.[5] On February 5, 2014, UMG filed a motion to dismiss certain claims in the second amended complaint, and to dismiss the complaint in intervention in its entirety.[6] Jamerson, Van Dyke, and Willis (collectively "plaintiffs") oppose UMG's motion.[7]

# I. BACKGROUND

Annie Jamerson and Millicent Van Dyke are the widows, respectively, of James Jamerson and Earl Van Dyke, who, with Eddie Willis, were musicians under contract to the Motown Record Corporation ("Motown") during the 1960s, 1970s, and 1980s.[8] UMG is the successor-in-interest to Motown.[9] Plaintiffs contend UMG owes them royalties under a series of contracts into which James Jamerson, Earl Van Dyke, and Eddie Willis entered with Motown.

Plaintiffs allege the royalties are due under two types of contracts. First, each musician had term contracts with Motown (the "Artist Agreements"), which provided for the payment of royalties calculated as a percentage of sales of recordings covered by the contracts. Jamerson and Van Dyke allege that their husbands entered into several of these contracts with Motown; Willis,

---

[2]Order to Reassign Case Due to Self-Recusal, Docket No. 4 (Apr. 30, 2013).

[3]First Amended Complaint, Docket No. 17 (July 29, 2013).

[4]Second Amended Complaint ("SAC"), Docket No. 38 (Jan. 8, 2014).

[5]Complaint In Intervention of Eddie Willis ("Willis Complaint"), Docket No. 37 (Jan. 8, 2014).

[6]Motion to Dismiss ("MTD"), Docket No. 42 (Feb. 5, 2014).

[7]Opposition to Defendant's Motion to Dismiss, Docket No. 50 (Mar. 27, 2014).

[8]SAC, ¶¶ 1, 2, 18, 32-35; Willis Complaint, ¶¶ 1, 13, 17. Only Jamerson remained under contract in the 1980s. (SAC, ¶ 27.)

[9]*Id.*, ¶ 12.

by contrast, does not contend that he was a party to such a contract. Each of the Artist Agreements provides that it will be governed by Michigan law.[10]

On December 5, 1961, Motown signed James Jamerson to a four year recording agreement (the "1961 Jamerson Agreement"), which it subsequently renewed for another four years.[11] On July 30, 1969, Motown signed James Jamerson to two additional interrelated agreements.[12] The first agreement (the "1969 Jamerson Agreement") was a one-year recording contract that automatically renewed for additional terms of one year unless Motown gave written notice that it was terminating the agreement.[13] Annie Jamerson alleges that Motown never gave her husband written notice of termination, and that the agreement therefore renewed automatically each year until his death in 1983.[14] The second agreement (the "1969 Jamerson Guarantee Agreement") guaranteed James Jamerson, *inter alia*, a minimum payment of $50,000 per year, irrespective of the income to which he was entitled under contracts with Motown and its affiliates.[15] On July 30, 1969, James Jamerson signed a third agreement with Jobete Music Compnay, Inc. ("Jobete"), Motown's publishing arm.[16]

Motown signed Earl Van Dyke to a recording agreement on October 1, 1963 (the "1963 Van Dyke Agreement"), which it renewed annually for six years.[17] On February 3, 1964, Motown signed him to a second recording agreement (the "1964 Van Dyke Agreement"),

[10] *Id.*, Exh. B, ¶ 18; Exh. D, ¶ 18; Exh. D-1, ¶ 12; Exh. D-2, ¶ 18; Exh. F, ¶ 17; Exh. G, ¶ 12; Exh. I, ¶ 18.

[11] *Id.*, ¶¶ 18-19, Exh. B.

[12] *Id.*, ¶ 24.

[13] *Id.*, ¶ 24; Exh. D.

[14] *Id.*, ¶ 27.

[15] *Id.*, ¶ 25; Exh. D.

[16] *Id.*, ¶ 24; Exh. D-2.

[17] *Id.*, ¶ 34; Exh. F.

pursuant to which Motown agreed to pay Van Dyke royalties for a specific work on which he performed.[18] On June 7, 1965, Motown and Earl Van Dyke entered into an amendment or modification of the 1963 Agreement (the "1965 Van Dyke Modification"), which providing for the payment of royalties on overseas sales.[19] On April 17, 1969, they entered into another agreement (the "1969 Van Dyke Agreement"), which remained in force until it was terminated by Motown on March 25, 1973.[20]

Annie Jamerson and Millicent Van Dyke allege that each of the 1961 and 1969 Jamerson Agreements and the 1963, 1965, and 1969 Van Dyke Agreements obligated Motown to pay royalties for all works on which the musicians performed under those agreements.[21] They contend that UMG has breached the agreements by continuing to exploit master recordings of performances covered by the contracts without paying royalties.[22] UMG contends the contracts require the payment of royalties only for specific recordings on which James Jamerson and/or Earl Van Dyke performed as "lead artist," but that royalties are not due for recordings on which they performed as backup musicians.[23] Annie Jamerson and Millicent Van Dyke allege they learned of the Artist Agreements only in 2012.[24]

The second type of contract under which plaintiffs seek royalties is a "B-Form" American Federation of Music contract (the "AFM contracts"), which required the payment of wages for

---

[18]*Id.*, ¶ 38; Exh. G.

[19]*Id.*, ¶ 39; Exh. H.

[20]*Id.* ¶¶ 40, 41, 45; Exhs. I, J.

[21]*Id.*, ¶¶ 20, 21, 24, 28, 36, 41, 43. The 1964 Van Dyke Agreement required the payment of royalties for a specific work on which Earl Van Dyke performed, while the 1965 modification required the payment of royalties on overseas sales. (*Id.*, ¶¶ 38, 39.)

[22]*Id.*, ¶¶ 30, 55.

[23]MTD at 2.

[24]SAC, ¶ 52.

4

performing at specific recording sessions.[25] The contracts specify that the "Type of Engagement" they cover is "[r]ecording for phonograph records only."[26] They provide that "the employer hires the employees as musicians severally on the terms and conditions below and as further [specified] on [the] reverse side."[27] Annie Jamerson and Millicent Van Dyke do not attach a copy of the reverse side of the contract to their second amended complaint so the court does not know the complete terms of the contracts. They assert that, to the extent the court accepts UMG's contention that the royalty provisions in the Artist Agreements apply only to recordings on which the musicians performed as lead artist, they are nonetheless entitled, in the alternative, to compensation under the AFM Contracts. Specifically, they contend they are owed compensation for any revenue UMG derived from sources other than phonograph records – such as digital downloads and Internet Radio – for musical titles on which the musicians performed as session musicians under an AFM Contract.[28] Annie Jamerson and Millicent Van Dyke allege they did not become aware of the AMF contracts until late 2013.[29] They further allege that the AFM contracts are governed by Michigan law.[30]

Jamerson and Van Dyke allege claims for (1) breach of the 1961 and 1969 Jamerson Agreements, the 1969 Jamerson Guarantee Agreement, the 1963 and 1969 Van Dyke Agreements, and the 1965 Van Dyke Modification under Michigan law; (2) breach of the AFM Contracts under Michigan law; (3) an accounting under Michigan law; (4) unjust enrichment under Michigan law; (5) common law unfair competition under Michigan law; and (6) violation of California Business

---

[25]*Id.*, ¶¶, 22-23, Exh. C. Plaintiffs attach a single exemplar of such an agreement. The contract is between Motown and eight individuals, including Jamerson, Van Dyke, and Willis, and was executed on December 22, 1966. (*Id.*, Exh. C.)

[26]*Id.*, Exh. C.

[27]*Id.*

[28]*Id.*, ¶¶ 22, 29, 37, 44; Willis Complaint, ¶¶ 13, 18.

[29]*Id.*, ¶ 52.

[30]*Id.*, ¶ 54.

& Professions Code § 17200 and common law unfair competition under California law.[31] In his complaint-in-intevention, Willis pleads all of these claims except breach of the Jamerson and Van Dyke Agreements. UMG moves to dismiss the second, third, fourth, and fifth causes of action of the second amended complaint, as well as the portion of the first cause of action that seeks royalties for recordings on which Jamerson or Van Dyke did not perform as lead artist. It moves to dismiss the complaint-in-intervention in its entirety.

## II. DISCUSSION

### A. Legal Standard Governing Motions to Dismiss under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995). It need not, however, accept as true unreasonable inferences or legal conclusions cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)). Thus, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that

---

[31]Jamerson and Van Dyke denominate their unfair competition claim under Michigan law the "Sixth Cause of Action," and their California unfair competition claims the "Seventh Cause of Action." The second amended complaint contains no fifth cause of action, and thus pleads a total of six claims.

is plausible on its face.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); see also *Twombly*, 550 U.S. at 545 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly*).

As the Ninth Circuit has explained: "First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

### B. Whether the Court Should Apply Michigan Law

Annie Jamerson and Millicent Van Dyke allege that all of the contracts at issue in this case are governed by Michigan law.[32] UMG does not dispute that Michigan law applies. It contends, however, that plaintiffs' contract claims must be dismissed because they are barred by Michigan's statute of limitations and because the AFM Contracts grant it the unrestricted right to

---

[32]SAC, ¶ 54. Although Willis' complaint-in-intervention does not specify whether California or Michigan law applies to his breach of contract, accounting, and unjust enrichment claims, his claims are nearly identical to those alleged by Jamerson and Van Dyke, and he attaches to his complaint-in-intervention a copy of the same AFM contract that is an exhibit to the second amended complaint. (Willis Complaint, Exh. A.) Willis, moreover, joins in the opposition Jamerson and Van Dyke have filed, which argues that the Michigan statute of limitations applies. Accordingly, the court presumes that Willis too argues Michigan law controls. The court therefore employs the same choice of law analysis in assessing both plaintiffs' and Willis' claims.

own and exploit sound recordings made pursuant to them. UMG contends the remaining claims must be dismissed because they too are time-barred under Michigan law, and because they are derivative of the breach of contract claims. As noted, each of the Artist Agreements contains a choice of law provision that requires the application of Michigan law.[33] Although the portion of the AFM contract attached to the complaints does not include a choice of law provision, plaintiffs allege that they too are governed by Michigan law;[34] the court construes this as an allegation that the AFM contracts contain a choice of law provision providing for the application of Michigan law.

"In resolving conflict of laws issues, California courts have recognized that the statutes of limitations are part of a state's law.'" *Hambrecht & Quist Venture Partners v. American Medical Internat., Inc.*, 38 Cal.App.4th 1532, 1540 (1995). In general, "California uses the test set forth in *Nedlloyd Lines B.V. v. Superior Court*[, 3 Cal.4th 459 (1992),] to determine whether to enforce a choice of law provision. This test draws heavily on section 187 of the Restatement Second of Conflict of Laws[.]" *It's Just Lunch Intern. LLC v. Island Park Enterprise Grp., Inc.*, No. EDCV 08-367-VAP (JCRx), 2008 WL 4683637, *2 (C.D. Cal. Oct. 21, 2008) (citations omitted). Section 187 "reflects a strong policy favoring enforcement of such provisions." *Nedlloyd Lines B.V.*, 3 Cal.4th at 462.

> "Under *Nedlloyd*, California will apply the law indicated by the choice of law provision where: '[1] the chosen state has a substantial relationship to the parties or their transaction,' or where '[2] there is any other reasonable basis for the parties' choice of law. If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law.' Where either test is met, the court proceeds to the second step and 'determine[s] whether the chosen state's law is contrary to a fundamental policy of California. Once the party who seeks

---

[33]SAC, Exh. B, ¶ 18; Exh. D, ¶ 18; Exh. D-1, ¶ 12; Exh. D-2, ¶ 18; Exh. F, ¶ 17; Exh. G, ¶ 12; Exh. I, ¶ 18.

[34]*Id.*, ¶ 54.

application of the choice of law provision demonstrates a substantial relationship, the party who would avoid the choice of law provision bears the burden of showing that the California law embodies a fundamental policy.' Where 'there is a fundamental conflict with California law,' the court proceeds to the third step and 'determine[s] whether California has a materially greater interest than the chosen state in the determination of the particular issue. If California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstance we will decline to enforce a law contrary to this state's fundamental policy.'" *It's Just Lunch Intern.*, 2008 WL 4683637 at *2 (quoting *Nedlloyd*, 3 Cal.4th at 466).

See *Hatfield v. Halifax PLC*, 564 F.3d 1177, 1182 (9th Cir. 2009) ("Once it determines the parties' intention, a California state court will next analyze whether: (1) the chosen jurisdiction has a substantial relationship to the parties or their transaction; or (2) any other reasonable basis for the choice of law provision exists. If either one of these tests is met, then a California court will enforce the provision unless the chosen jurisdiction's law is contrary to California public," citing *Hughes Elecs. Corp. v. Citibank Del.*, 120 Cal.App.4th 251, 258 (2004)).

The parties to a contract have a substantial relationship with the chosen state if at least one party is incorporated there. *Nedlloyd*, 3 Cal.4th at 467 ("A party's incorporation in a state is a contact sufficient to allow the parties to choose that state's law to govern their contract"); *Hambrecht & Quist Venture Partners*, 38 Cal.App.4th at 1546 ("If one of the contracting parties is incorporated in the chosen state, then all of the contracting parties have a substantial relationship to that state for choice-of-law purposes. Thus, it is of no consequence that most of the plaintiffs in this case are residents or domiciliaries of California or some state other than Delaware" (citation omitted)). Here, all of the contracts at issue have a substantial relationship to Michigan because Motown is a party to each contract, and it was incorporated in Michigan.[35] Moreover, addresses included in the Agreements indicate that James Jamerson, Earl Van Dyke, and Eddie

---

[35]See *Id.*, Exh. D-1 (identifying Motown as a Michigan corporation).

Willis resided in Michigan. Finally, the AFM contracts provide that the place of performance is Michigan.[36] Accordingly, the court concludes that the parties have a substantial relationship to Michigan.

The second step in the *Nedlloyd* analysis requires that the court "determine whether the chosen state's law is contrary to a fundamental policy of California." Where enforcement of the choice of law provision would contravene a fundamental policy of California, the court must decline to enforce the provision if it finds that 'California has a materially greater interest than the chosen state in the determination of a particular issue. . . .'" *It's Just Lunch Intern. LLC*, 2008 WL 4683637 at *3 (quoting *Nedlloyd*, 3 Cal.4th at 466).

In general, California courts have permitted parties to extend or shorten the length of the otherwise applicable California statute of limitations by contract. *Hambrecht & Quist Venture Partners*, 38 Cal.App.4th at 1547 (citing 3 B. Witkin, CAL. PROCEDURE (3D ED. 1985) ACTIONS, §§ 333–34); see also *ABF Capital Corp. v. Berglass*, 130 Cal.App.4th 825, 835 (2005) ("California allows contracting parties to both shorten and extend limitation periods and has no discernible fundamental policy against the application of other jurisdictions' limitation periods"). The statute of limitations on a breach of contract claim is six years under Michigan law, MICH. COMP. LAWS § 600.5807(8) (2000); in California, it is four years, CAL. CODE CIV. PROC. § 337. The Ninth Circuit has held that application of a six-year contract statute of limitations does not violate California public policy. See *Hatfield*, 564 F.3d at 1183 (holding that application of a six-year English statute of limitations for contract disputes did not violate California public policy).

Similarly, application of Michigan's breach of contract law would not contravene a fundamental policy of California. To state a claim for breach of contract under Michigan law, a plaintiff must allege (1) that a contract existed; (2) that the contract required the performance of certain actions; (3) that defendant breached the contract, and (4) that the breach injured plaintiff. *Groeb Farms, Inc. v. Alfred L Wolff, Inc.*, No. 08-CV-14624, 2009 WL 500816, *3 (E.D. Mich.

---

[36]*Id.*, Exh. C.

10

Feb. 27, 2009).  Under California law, the elements are (1) the existence of a contract; (2) the party's performance under that contract or an excuse for nonperformance; (3) the defendant's breach; and (4) resulting damages.  *Alvarado v. Aurora Loan Services, LLC*, No. SACV 12–0524 DOC (JPRx), 2012 WL 4475330, *4 (C.D. Cal. Sept. 20, 2012) (citing *McKell v. Washington Mut., Inc.*, 142 Cal.App.4th 1457, 1489 (2006)).  Thus, the states' laws differ only insofar as under California law a plaintiff can allege an excuse for nonperformance.  Neither party, moreover, challenges the application of Michigan law.  Consequently, the court will enforce the choice of law provision and apply Michigan law to determine whether Jamerson's, Van Dyke's and Willis' breach of contract claims are time-barred and whether they have substantive merit.[37]

"A 'valid choice-of-law clause, which provides that a specified body of law 'governs' the 'agreement' between the parties, encompasses all causes of action arising from or related to that agreement, regardless how they are characterized, including tortious breaches of duties emanating from the agreement or the legal relationships it creates."  *Audio Marketing Servs., S.A.S. v. Monster Cable Products, Inc.*, No. C 12–04760 WHA, 2013 WL 633202, *2 (N.D. Cal. Feb. 20, 2013) (quoting *Nedlloyd*, 3 Cal.4th at 470).  Consequently, the court will apply Michigan law

_____

[37]California Civil Code § 1646 also requires that Michigan law be applied in interpreting the contracts.  *Frontier Oil Corp. v. RLI Ins. Co.*, 153 Cal.App.4th 1436, 1443 (2007); *id.* at 1460 ("Civil Code section 1646 determines the law governing contract interpretation notwithstanding the application of the governmental interest analysis to other choice-of-law issues").  Section 1646 provides: "A contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."  CAL. CIV. CODE § 1646.  "A contract 'indicate[s] a place of performance' within the meaning of section 1646 if the contract expressly specifies a place of performance or if the intended place of performance can be gleaned from the nature of the contract and its surrounding circumstances."  *Frontier Oil Corp.*, 153 Cal.App.4th at 1443.  The AFM contract states that the place of engagement is Motown Record Corporation, 248 W. Grand Boulevard, Detroit, Michigan.  Although the Artists Agreements do not identify a place of performance, every contract except for the 1963 and 1965 Van Dyke Agreements was executed and notarized in Michigan.  Accordingly, § 1646 mandates application of Michigan law to interpret the Artist Agreements and AFM contracts.

to the remaining causes of action as well, i.e., the claims for unjust enrichment, an accounting, and unfair competition, because all emanate from the contracts.

## C. Whether Plaintiffs' Breach of Contract Claims are Time-Barred

As a threshold matter, UMG contends that plaintiffs' breach of contract claims are barred by the statute of limitations.[38] As noted, under Michigan law, breach of contract claims are subject to a six year statute of limitations. MICH. COMP. LAWS § 600.5807(8) (2000) ("No person may bring or maintain any action to recover damages or sums due for breach of contract, or to enforce the specific performance of any contract unless, after the claim first accrued to himself or to someone through whom he claims, he commences the action within the periods of time prescribed by this section. . . . (8) The period of limitations is 6 years for all other actions to recover damages or sums due for breach of contract"); *Santino v. Provident Life and Acc. Ins. Co.*, 276 F.3d 772, 776 (6th Cir. 2001). A breach of contract claim accrues "at the time the wrong upon which the claim is based was done regardless of the time when damage results." MICH. COMP. LAWS 600.5827; *Scherer v. Hellstron*, 270 Mich.App.458, 463 (2006). To determine the wrong on which the claim is based, the court looks first to the parties' agreement. *Id.*

UMG contends that plaintiffs' claims accrued at the time Motown's "interpretation of the contract was implemented," not each time an alleged underpayment based on that interpretation.[39] Stated differently, UMG asserts that the breach of contract claims accrued on the first date that it did not pay royalties under each agreement that plaintiffs and Willis contend were due. Plaintiffs counter that each purported failure to pay royalties started a new limitations period. They do not allege that any sales were made, or that any specific payments were due, within six years of the date on which they filed their complaints.[40]

---

[38]MTD at 11.

[39]*Id.* at 13.

[40]In their opposition, plaintiffs argue that musical works covered by the contracts were performed with six years of their commencement of this action. (Opposition at 13.) They cite

12

The statute of limitations, however, is an affirmative defense. Complaints can be dismissed on the basis of an affirmative "only when [the defense is] established on the face of the complaint." *Bonds v. Nicoletti Oil, Inc.*, No. CV-F-07-1600 OWW/DLB, 2008 WL 2233511, *4 (E.D. Cal. May 28, 2008). Thus, "[w]hen a motion to dismiss is based on the running of the statute of limitations, it can be granted only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled" or had not expired. *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980); see also *Pisciotta v. Teledyne Industries, Inc.*, 91 F.3d 1326, 1331 (9th Cir. 1996) (same); *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995) ("[A] complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the complaint"). It is not apparent from the face of plaintiffs' complaints that all of the royalty payments at issue were due prior to six years before the filing of the complaint; plaintiffs allege only that UMG has sold the recordings "in recent years."[41] At this stage of the proceedings, therefore, the court cannot say that plaintiffs will be unable to prove their claims are timely.

---

"The Poker House," a film released on June 20, 2008, which featured "Ain't No Mountain High Enough," a song covered by the AMF Contract. (*Id.*; Exhs. B, C.) The court cannot consider facts that are not alleged in the complaint or subject to judicial notice in deciding a motion to dismiss, however. See *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) ("In ruling on a 12(b)(6) motion, a court may generally consider only the allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice"); *Schneider v. California Dept. of Corrections,* 151 F.3d 1194, 1197 n. 1 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss"). See also *Grosso v. Miramax Film Corp.*, 400 F.3d 658, 659 (9th Cir. 2005) ("[O]ur inquiry begins and ends with Grosso's First Amended Complaint"); *Garza v. Endo Pharmaceuticals*, No. CV 12–1585–CAS (OPx), 2012 WL 5267897, *2 (C.D. Cal. Oct. 24, 2012) ("Plaintiffs present a number of potential theories by which CVS may have acted negligently in their opposition but arguments in an opposition are not factual allegations that this Court may consider on a motion to dismiss plaintiffs' complaint. Accordingly, the Court grants defendant's motion to dismiss plaintiffs' negligence claim"); *Stine v. Trotter*, No. EDCV 08-00251-RGK (MLG), 2008 WL 4068904, *4 (C.D. Cal. Aug. 13, 2008) ("On a motion to dismiss the Court will not consider factual allegations made in a plaintiff's opposition").

[41]SAC, ¶ 59; Willis Complaint, ¶ 18.

13

Consequently, to the extent UMG's motion to dismiss is based on the statute of limitations, it must be denied.[42]

Because the parties devote so much of their briefs to arguing the standard under which the timeliness of plaintiffs' claims should be judged, however, the court considers their arguments in that regard to provide some guidance as the case moves forward. Plaintiffs offer various reasons as to why their claims are timely with respect to at least some of the royalty payments. First, they contend that each exploitation of a recording performed under one of the agreements is an independent "wrong" that starts a new six year limitations period.[43] Successive violations of a contract can constitute independent breaches for limitations purposes under certain circumstances. In *Citizens Bank v. Merrill, Lynch, Pierce, Fenner and Smith, Inc.*, No. 11–CV–14502, 2012 WL 5828623, *7-8 (E.D. Mich. July 6, 2012), a bank loaned more than $2 million to L & L, a non-party, secured by a brokerage account maintained by defendant. *Id.* at *1. The bank alleged that, in violation of an agreement that gave plaintiff exclusive control of the account, defendant

---

[42]Although Jamerson and Van Dyke allege they did not learn of the contract breaches until 2012 and 2013, this allegation has no effect on whether their claims are timely. "Under a discovery-based analysis, a claim does not accrue until a plaintiff knows, or objectively should know, that he has a cause of action and can allege it in a proper complaint." *Trentadue v. Gorton*, 479 Mich. 378, 389 (2007). As UMG correctly notes (MTD at 13), the Michigan Supreme Court has held that the discovery rule does not apply to extend the limitations period on breach of contract claims. See *id.* at 391-92 ("[W]e conclude that courts may not employ an extrastatutory discovery rule to toll accrual in avoidance of the plain language of MCL 600.5827"). Plaintiffs do not respond to this argument, and the court concludes that under Michigan law, a breach of contract claim accrues on the date of breach, not the date that breach is discovered. *Thate v. General Motors Corp.*, No. 07-11370, 2008 WL 4372633, *6 (E.D. Mich. Sept. 19, 2008) ("Michigan abrogated the common-law discovery rule, which allows tolling of the statutory period of limitations when a plaintiff could not have reasonably discovered the elements of a cause of action within the limitations period. Thus, MCL 600.5827 solely governs the accrual of actions," citing *Trentadue*, 479 Mich. 378). See also *Romeo Inv. Ltd. v. Michigan Consol. Gas Co.*, No. 260320, 2007 WL 1264008, *3 (Mich. App. May 1, 2007) (Unpub. Disp.) ("[A] breach of contract claim accrues on the date of the breach, not the date the breach is discovered. . . . Because this case is essentially a contract action, and given the circumstances involved, we decline to hold that the trial court erred in rejecting application of the discovery rule" (quotation marks and citation omitted)); *id.* at *7 ("[T]he discovery rule is inapplicable in contract actions").

[43]Opposition at 12-14.

14

wrongfully executed trade orders from entities other than plaintiff that depleted the account. *Id*. The agreement required defendant to send plaintiff "duplicate copies of periodic account statements and trade confirmations, if any, contemporaneously with those sent to [L & L]." *Id*. Plaintiff did not discover the breach until more than five years after the allegedly wrongful trades began, when it demanded that defendant furnish account statements. *Id*. at *2. Defendant argued that all of plaintiff's claims accrued at the time of the first breach. *Id*. at *7. Applying Michigan law, the court rejected this argument, concluding that it "ignore[d] the fact that Plaintiff alleges subsequent breaches," as well as "the text of § 600.5827, which provides that claims accrue when the wrong is done." *Id*. The court held that each improper trade, and each failure by defendant to send an account statement as required, constituted a separate cause of action for statute of limitations purposes. *Id*.

UMG cites inapposite cases in which courts applying the law of states other than Michigan held that breach of contract claims accrued at the time of first breach.[44] It also cites distinguishable Michigan authority. In *Auto-Owners Ins. Co. v. Edward D. Jones & Co. Employee Health and Welfare Program*, 759 F.Supp.2d 895, 898 (W.D. Mich. 2010), an ERISA plan refused to continue paying the medical bills of an injured plan participant several months after his accident. The participant's employer made a series of payments that it argued the plan should have made and sued. *Id*. at 899. The court held that the claim was barred by the statute of limitations. *Id*. at 902. The court concluded that the claim accrued on the date the plan first rejected the participant's medical bills. *Id*. at 903. It rejected the employer's argument that each payment started a new limitations period because "[a] claim accrues as soon as suit may be brought, and later damages do not toll the running of the clock." *Id*. at 902. In *Marilyn Froling*

---

[44] Reply in Support of Motion to Dismiss Certain Claims of the Second Amended Complaint and the Complaint in Intervention in its Entirety ("Reply"), Docket No. 51 (Apr. 2, 2014) at 7 (citing *Air Transport Ass'n of America v. Lenkin*, 711 F. Supp. 25, 27-28 (D.D.C. 1989) (applying the law of the District of Columbia); *Mappa Music Co. v. Universal-Polygram Int'l Pub. Inc.*, No. CV 00–6593 ABC (AIJx), 2001 WL 1868083, *8 (C.D. Cal. Dec. 17, 2001) (applying California law); *Brown v. Cosby*, 433 F.Supp. 1331, 1342 (E.D. Pa. 1977) (applying California law).

15

*Revocable Living Trust v. Bloomfield Hills Country Club*, 283 Mich.App. 264, 268 (2009), a residential property flooded in 2001 and again in 2004 as a result of construction work by the owners of several neighboring properties that ended, at the latest, in 1998. The court held that plaintiff's claims accrued on the date of the flooding in 2001, because the neighbors did no construction work after 1998 and thus the 2004 flooding was the result of the same wrongful acts as the 2001 flooding. *Id.* at 291.

Here, the breaches alleged by plaintiffs are more like the serial trades in *Citizens Bank* than the failure to pay in *Auto-Owners* or the flooding in *Froling*. Motown or UMG could at any time have made the payments plaintiffs contend were due, just as the defendant in *Citizens Bank* could have ceased making the unauthorized trades. In contrast, the defendants in *Froling* could not have remedied their purportedly wrongful conduct at any point after 1998. While the facts in *Auto-Owners* do not support the court's outcome as clearly as those in *Froling*, in that the plan could have reassessed whether its obligation to make payments was secondary to the employee's automobile insurer at the time each payment was made, the court appears to have viewed the plan's decision as unitary, covering all future payments. Such a result follows from the fact that all payments flowed from the same automobile accident. See *Chormann v. PNC Financial Services Group, Inc.*, No. 1:11–cv–555, 2012 WL 113549, *4 (W.D. Mich. Jan. 13, 2012) (distinguishing the author's earlier decision in *Auto-Owners*, and concluding that it did not involve an installment contract because "defendant's successive failures to pay a series of medical bills pertaining to a single accident should not be considered as separate breaches when the denials were all based on defendant's initial determination that it was a secondary insurer").

Michigan appears to treat royalty payments differently. Specifically, the Michigan courts have held that "contracts that require regular or periodic payments are similar . . . or analogous to installment contracts." *Romeo Inv. Ltd.*, 2007 WL 1264008 at *6 ("The lease agreement in this case required defendant to make regular royalty payments to plaintiff on either a monthly or quarterly basis. Therefore, although not technically an installment contract in the strictest sense of the term, the lease agreement was in the nature of an installment contract. Each allegedly deficient royalty payment made to plaintiff constituted a separate and discrete breach of the lease

16

agreement," citing *H.J. Tucker and Associates, Inc. v. Allied Chucker and Engineering Co.*, 234 Mich.App. 550, 562-63(1999) (contract for the payment of commissions on monthly sales was treated as an installment contract for statute of limitations purposes). See also *Schaefer v. AXA Equitable Life Ins. Co.*, 345 Fed. Appx. 87, 96-97 (6th Cir. Sept. 2, 2009) (Unpub. Disp.) (rejecting defendant's argument that a breach of contract claim based on the failure to make monthly disability payments under a disability insurance policy "accrued when [d]efendants advanced their interpretation of [p]laintiff's benefits under the policy," because "individual disability policies are payable monthly, and accordingly, that the right to payment accrues monthly"); *Seto v. Adco Products, Inc.*, No. 237208, 2003 WL 22205601 (Mich. App. Sept. 23, 2003) (Unpub. Disp.) (holding, in a case involving royalties on caulk and adhesive sealing sales, that, "[l]ike other cases involving contracts for percentages of sales, the contract for royalties in this case are akin to an installment contract").[45] Indeed, the Sixth Circuit's decision in *Schaefer* appears to reject the very theory UMG advances as to why plaintiffs' contract claims are time-barred. For this reason, and on the present record, the court cannot conclude that the claims are untimely.[46] Plaintiffs, in fact, cite *Tucker*'s installment contract analysis as another reason

[45]"Although the court is not bound by unpublished decisions of intermediate state courts, unpublished opinions that are supported by reasoned analysis may be treated as persuasive authority." *Scottsdale Ins. Co. v. OU Interests, Inc.*, No. C 05-313 VRW, 2005 WL 2893865, *3 (N.D. Cal. Nov. 2, 2005) (citing *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value")).

[46]Plaintiffs also assert the claims are timely under the "continuing wrong" doctrine – also known as the "continuing violation" doctrine. (Opposition at 15.) "Where a defendant's wrongful acts are of a continuing nature, the period of limitation will not run until the wrong is abated; therefore, a separate cause of action can accrue each day that the defendant's tortious conduct continues." *Horvath v. Delida*, 213 Mich.App.620, 626 (1995); see also *Romeo Inv. Ltd.*, 2007 WL 1264008 at *7 ("The 'continuing wrong' doctrine provides that a claim based on the defendant's wrongful conduct will re-accrue each day that the wrongful conduct is continued"). Damages are limited to "those occurring within the applicable limitation period and, where appropriate, after the filing of the complaint." *Horvath*, 213 Mich.App. at 626. UMG argues that Michigan has abrogated the continuing wrong doctrine. In *Garg v. Macomb Cnty. Mental Health Servs.*, 472 Mich. 263 (2005), the Michigan Supreme Court overruled *Sumner v. Goodyear Tire & Rubber Co.*, 427 Mich. 5050 (1986), to the extent it applied the "continuing

17

violation" doctrine to a civil rights employment discrimination action. Michigan courts are split as to whether *Garg* abrogates the doctrine entirely, or only with respect to claims filed under Michigan's Civil Rights Act, MICH. COMP. LAWS § 37.2101, and its Persons with Disabilities Rights Act, MICH. COMP. LAWS § 37.1101. See *Marilyn Froling Revocable Living Trust*, 283 Mich.App. at 282 ("The law relating to the current viability of the continuing wrongs doctrine in the context of nuisance and trespass claims is hopelessly confused," collecting cases). Courts consistently hold, however, that the doctrine does not apply to breach of contract claims that do not involve contracts for personal services. See *Romeo Inv. Ltd.*, 2007 WL 1264008 at *7 ("Application of the 'continuing wrong' doctrine has been rejected in the context of claims for breach of contract"); *Commercial Coin Laundry Sys. v. McGraw*, No. 256026, 2005 WL 3481459, *2 (Mich. App. Dec. 20, 2005) (Unpub. Disp.) ("Finally, plaintiff argues that the 'continuing wrong' theory served to extend the period of limitations for its breach of contract action because defendant's contractual obligation not to install or permit others to operate laundry machines was a continuous contractual obligation. We disagree. Plaintiff's argument under this issue fails to consider this Court's holding in *Blazer Foods, Inc v. Restaurant Properties Inc.*, 259 Mich.App 241, 251 [ ] (2003), that the continuous wrong theory applies to a very narrow class of legal claims that simply do not include an action for a breach of contract. The *Blazer* Court stated that the doctrine of continuing wrong typically applies only to trespass, nuisance and civil rights claims. The *Blazer* Court acknowledged that the continuing wrong theory may apply when one party continued to perform on a personal service contract and the other party refused payment" (citations omitted); *Blazer Foods, Inc. v. Restaurant Properties, Inc.*, 259 Mich.App. 241, 251 (2003) ("Plaintiffs have identified no cases extending the continuing wrong or continuing services theories to a situation in which a party to a contract fails to perform [services] adequately under the contract"). Accordingly, plaintiffs' claims are not timely under the "continuing wrong" or "continuing violation" doctrine.

Plaintiffs' argument that the claims are timely under an open account theory is similarly unavailing. (Opposition at 18.) "[A]ctions on an open account have long been recognized in Michigan." *Fisher Sand and Gravel Co. v. Neal A. Sweebe, Inc.*, 494 Mich. 543, 563 (2013). Open account claims cannot be brought, however, when an express contract governs the payment of money. *Id.* at 568 ("We hold that when an integral component of a transaction for goods or services is an express agreement for the periodic payment of money, an open account claim cannot be established by the mere performance or nonperformance of the contract obligation. Under those circumstances, the creditor's remedy is to timely pursue a breach of contract action when the debtor fails to live up to the terms of the underlying agreement. But when the credit relationship is not defined as an integral part of the transaction for goods or services, and instead arises from a course of dealing between the parties, an open account claim may arise by implied contract"); *Seyburn, Kahn, Ginn, Bess, Deitch & Serlin, P.C. v. Bakshi*, 483 Mich. 345, 357 (2009) ("An open account is one which consists of a series of transactions and is continuous or current, and not closed or stated. However, all accounts which are not stated or reduced to writing are not necessarily open accounts. Thus, cases of bailment, or express contract defining the liabilities of the parties, whether evidenced by writings or not, are not as a general rule open accounts,'" quoting *A. Krolik & Co. v. Ossowski*, 213 Mich. 1, 7 (1920)). Here, plaintiffs allege the

portions of their claims are timely.[47]  In *Tucker*, plaintiff was a sale representative who alleged that defendant had failed to pay commissions calculated as a percentage of sales on sales and customers he procured for it.  234 Mich.App. at 554.  After a number of years, defendant reduced the percentage commission it paid plaintiff on certain sales and eliminated it altogether on others.  In 1993, plaintiff sued to recover the full amount of commissions he believed he was owed since 1986.  *Id*. at 555.  The court rejected defendant's argument that plaintiff's entire claim accrued in 1986 and that the breach of contract claim was thus time-barred.  *Id*. at 562.  It reasoned that "the commissions earned by plaintiff were separately computed, were to be paid monthly, and were of a periodic nature."  It thus held that they were analogous to claims for payments under an installment contract, alimony payments, and monthly pension payments, which accrue on the date each payment becomes due, *id*. at 562-63, and that plaintiff was entitled to recover commissions that fell due within the six-year limitation period, *id*. at 563.

Citing *Pinnacle Pizza Co. v. Little Caesar Enters.*, 598 F.3d 970, 978 (8th Cir. 2010), UMG counters that plaintiffs' contracts are not analogous to installment contracts and that as a result, *Tucker* does not control.[48]  There, a pizza franchisee alleged that the franchisor had breached the parties' franchise agreement and wrongfully appropriated advertising materials and the slogan, "Hot-N-Ready," for use by other franchisees without its consent.  *Id*. at 972.  Plaintiff

existence of contracts that required the payment of money by UMG.  Moreover, unlike Jamerson and Van Dyke, whose Artists Agreements state that Motown will maintain accounts of record sales and royalties received (see, e.g., SAC, Exh. F, ¶ 3(b)(ii) ("We agree to keep accurate books of account concerning sales of records made from masters produced hereunder and of royalties received on account of sales of such records by our assignees and licensees and to permit you (or a person designated by you) to inspect such books of account (insofar as they concern such records) at your expense during reasonable business hours at the premises where such books of account are ordinarily kept")), Willis has not alleged the existence of any account maintained by Motown and/or UMG in his name.  (Although plaintiffs attach a list of royalty accounts maintained by UMG to their opposition, the court is unable to consider materials outside of the pleadings in deciding UMG's motion.)  Accordingly, plaintiffs' claims are not timely under an open account theory.

[47]*Id*. at 16.

[48]Reply at 9.

argued that each use of the advertising materials and slogan constituted a separate and actionable breach, while defendant asserted all uses use of the materials ans slogan were a single, continuing breach that accrued on the date of first use. *Id.* at 976. Applying Michigan law, the Eighth Circuit held there was a single breach that accrued on the date of the first violation. *Id.* at 979. It reasoned that a franchise agreement that restricts a franchisor from using a franchisee's original advertising materials was not akin to an installment contract, and distinguished *Tucker* on three grounds. *Id.* at 978. First, it noted that, in *Tucker*, "the plaintiff sought payment for a series of individual and discrete referrals," which enabled the court to compute damages accruing within the limitations period. By contrast, it concluded that computing damages that resulted from the wrongful use of plaintiff's slogan during an "ubiquitous and national" advertising campaign would be impractical. *Id.* Second, the court observed that the contract in *Tucker* involved multiple breaches that had no relationship to one another, while the purported breach of the franchise agreement involved the uninterrupted use of a single phrase. *Id.* Third, it noted that the installment contract in *Tucker* required the payment of commissions that were calculated and reset periodically, giving rise to a duty that likewise reset when each payment came due. The franchise agreement, however, created an ongoing duty not to use original advertising materials created by the franchisee, which never reset. *Id.*

The contracts at issue here have far more in common with the contracts in *Tucker* and *Seto* than the franchise agreement in *Pinnacle Pizza*. The Artist Agreements provide for royalty payments based on a percentage of record sales, which can be easily calculated.[49] The royalty payments are not related to one another, as they represent sales for the preceding six month period.[50] As a result, the payments are calculated and reset periodically, giving rise to a duty that

---

[49]See, e.g., SAC, Exh. B, ¶ 3.

[50]*Id.*, ¶ 4.

reset every time six months passed.  Consequently, the court finds UMG's citation of *Pinnacle Pizza* inapposite.

UMG also relies on *Fritz v. Delfield Co.*, No. 238630, 2003 WL 21279555 (Mich. App. June 3, 2003) (Unpub. Disp.).[51]  In *Fritz*, the predecessor of a manufacturer of commercial kitchen equipment entered into a contract with plaintiffs to buy certain assets of plaintiffs' companies.  *Id.* at *1.  The agreement provided, *inter alia*, that defendant would pay a lump sum in addition to royalties based on net sales of products incorporating plaintiffs' invention.  *Id.* Defendant ceased making royalty payments in February 1997, and plaintiff sued, *inter alia*, for breach of contract.  *Id.*  The parties reached a settlement, and The trial court dismissed the case with prejudice.  A disagreement arose, however, as to whether the settlement payment covered all past and future claims under the contract, as defendant maintained, or only past damages, as plaintiffs asserted.  *Id.*  Plaintiffs therefore filed a second action. seeking damages and a declaration that defendant was obligated to make future payments.  *Id.* at *2.  The court held that the action was barred by res judicata, reasoning that plaintiffs could have sought a declaration in the first action that defendant was obligated to make future royalty payments.  In reaching this result, the court addressed briefly plaintiffs' contention that they could not have sought future payments in the first action because the agreement was an installment contract.  *Id.* at *4 n. 5. The court rejected this argument.  It noted an installment contract is characterized by an obligation to pay an aggregate amount, even though the entire sum is not due at one time, and that "while the contract [at issue] provide[d] for periodic payments for certain unspecified 'air system' components, there [was] no aggregate amount contemplated and the payments [were] not referable to portions of performance, but to the performance as a whole."  *Id.*

As can be seen, *Fritz* did not address application of the statute of limitations, but rather whether res judicata barred the plaintiff's second suit.  More fundamentally, *Fritz* is not inconsistent with *Tucker* and *Seto*, because those cases analogized the agreements at issue to installment contracts; they did not conclude that the agreements were, in fact, installment

---

[51]Reply at 9-10.

contracts. Other courts, moreover, have applied *Tucker* to contracts that were not strictly installment contracts. See *Romeo Inv. Ltd.*, 2007 WL 1264008 at *6 ("Therefore, although not technically an installment contract in the strictest sense of the term, the lease agreement was in the nature of an installment contract. Each allegedly deficient royalty payment made to plaintiff constituted a separate and discrete breach of the lease agreement"); *id.* at *7 ("[F]or a contract requiring separate periodic payments, the period of limitations begins to run at the time of each individual breach. The six-year period of limitations began to run separately at the time of each alleged underpayment in this case" (citation omitted)). See also MICH. COMP. LAWS § 600.5836 (providing that "claims on an installment contract accrue as each installment falls due"). Accordingly, the court concludes that plaintiffs may sue for royalty payments that were allegedly due within six years of the date the complaints were filed.

**D.    Whether the AFM Contracts Grant Motown the Unrestricted Right to Exploit Sound Recordings Made at the Recording Sessions**

Jamerson's and Van Dyke's second cause of action, and Willis' first cause of action, allege that Motown breached the AFM contracts by exploiting, without compensation, recordings covered by the contracts for uses other than the sale of phonograph records.[52] UMG contends these claims must be dismissed because Motown is the exclusive owner of common law copyrights in the recordings produced under the AFM contracts.[53] Plaintiffs assert that the phrase "[r]ecording for phonograph records only" limits the scope of the contract, and thus of UMG's rights, to exploitation of the recordings as phonograph records, and not as other media.

Sound recordings did not acquire federal copyright protection until February 15, 1972. Thus, protection for sound recordings made prior to this date is governed by state law. 17 U.S.C. § 301(c); *Capitol Records, Inc. v. Naxos of America, Inc.*, 373 F.3d 471, 477 (2d Cir. 2004) ("[S]ound recordings . . . were not protected by federal statute until 1972"); see also *Johnson v. Cypress Hill*, 641 F.3d 867, 870 (7th Cir. 2011) ( "[U]nder the Copyright Act, sound recordings

---

[52]SAC, ¶¶ 22, 29, 37, 44, 57-59; Willis Complaint, ¶¶ 11, 13, 18.

[53]MTD at 5.

fixed before February 15, 1972 are not subject to copyright protection, but may be protected by state law"). Plaintiffs allege that the recordings in question were made prior to February 15, 1972.[54] Consequently, their claims are governed by Michigan law. Neither party cites Michigan law, however. Instead, they rely primarily on Ninth Circuit authority.

Citing *Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1427 (9th Cir. 1996), UMG contends that it holds rights to the recordings because they were made at the instance and expense of Motown.[55] A "[c]ommon law copyright in a work initially vested in the author or authors thereof." 1 M. Nimmer & D. Nimmer, COPYRIGHT § 5.01 (2013) ("NIMMER ON COPYRIGHT"). Where a work is "made for hire," copyright law deems the employer the "author" for copyright ownership purposes. *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 137 (2d Cir. 2013). In *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298 (9th Cir. 1965), the Ninth Circuit became the first court to utilize the "instance and expense" test to determine whether works created by either independent contractors or employees were ones made for hire. *Siegel v. Warner Bros. Entertainment, Inc.*, 658 F.Supp.2d 1036, 1057 (C.D. Cal. 2009). The test creates a presumption in favor of work-for-hire ownership whenever a work is produced at the "instance and expense" of the hiring party. *Id*. UMG contends that plaintiffs are unable to overcome the "instance and expense" presumption because the AFM contract contains no express reservation by plaintiffs of any common law copyright interest.[56] It cites no authority for the proposition that Michigan law recognizes the "instance and expense" test, however. *Magnuson*, moreover, is inapposite, because the court there applied the Copyright Act of 1909 in holding that "[a] party that commissioned and paid for the production of the work was considered an author and held common law copyright to the work." Sound recordings were not protected by the 1909 Act. 1 NIMMER ON COPYRIGHT § 4.06[B] ("Sound recordings fixed prior to February 15, 1972, are not eligible for statutory copyright under the present Act, nor were they eligible for statutory copyright under

---

[54]SAC, ¶¶ 5, 63, 73; Willis Complaint, ¶¶ 3, 22, 25.

[55]MTD at 6.

[56]*Id*. at 7.

23

the 1909 Act, even after that Act was amended by the Sound Recording Act"); *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1329 (9th Cir. 2000) ("The 1909 Act does not cover sound recordings").

Neither party cites any authority setting forth the common law work for hire test employed in Michigan or establishing that sound recordings fixed prior to 1972 were protectable in Michigan. See *A & M Records, Inc. v. M.V.C. Distributing Corp.*, 574 F.2d 312, 313 (6th Cir. 1978) (stating, in a case involving unauthorized duplication and distribution of musical recordings fixed prior to February 15, 1972, that "[t]here were no Michigan statutes governing the alleged wrongful acts of MVC at the time this cause of action arose. . . . In the absence of a statute, any protectible property rights plaintiffs possess must derive from common law," and noting that "no Michigan decisions address the issue at bar"). The *M.V.C. Distributing* court held that in assessing claims of copyright infringement concerning recordings fixed prior to February 15, 1972, "Michigan courts follow the general law of unfair competition." *Id.* "Michigan's common law of unfair competition prohibits unfair and unethical trade practices that are harmful to one's competitors or to the general public." *Atco Industries, Inc. v. Sentek*, Nos. 232055, 235398, 2003 WL 21582962, *3 (Mich.App. July 10, 2003) (Unpub. Disp.).

Plaintiffs contend that UMG has exploited the recordings in media other than phonograph recordings without the right to do so. Although neither party has cited any relevant authority, this type of conduct may well be proscribed by Michigan's common law of unfair competition. See *Gilligham v. Ray*, 157 Mich. 488, 491 (1909) ("Having obtained the exclusive right to exhibit this film in Muskegon, [the assignee] had the same right of action against any person unlawfully or fraudulently invading that exclusive right that the Film Exchange Company itself would have had in the absence of the contract. It would hardly be contended that the corporation owning and controlling the use of this film could not protect its rights by suit to prevent the unauthorized use thereof"). The portion of the contract attached to plaintiffs' complaint, moreover, is incomplete, so that the court cannot determine if the agreement contains any terms denominating the recording a work for hire (or equivalent) or assigning the musicians' rights to Motown. The court is

24

therefore unable to conclude on this record that Motown, and thus UMG, acquired exclusive rights to exploit the sound recordings in any medium.

Plaintiffs assert the phrase "[r]ecording for phonograph records only" is a "carve-out" that reserves to the artists the exploitation of the recordings in a medium other than phonograph records.[57] They cite *Cohen v. Paramount Pictures Corp.*, 845 F.2d 851 (9th Cir. 1988), for the proposition that courts enforce such carve-outs. In *Cohen*, the court held that a license authorizing the "exhibition by means of television," and "reserv[ing] to the grantor 'all rights and uses in and to said musical composition, except those herein granted to the Licensee,'" could not "be construed as including the distribution of videocassettes for home viewing [because] VCRs for home use were not invented or known in 1969, when the license was executed." *Id.* at 854. The court distinguished the license from those in other cases that contained language expressly conferring the right to exhibit films by methods yet to be invented. *Id.* at 855. UMG distinguishes *Cohen* on the basis that the license there included a reservation of rights clause not found in the AFM contracts, and because it involved a copyright license, which the Ninth Circuit directs that courts interpret narrowly.[58] The parties also cite cases construing the term "phonograph" in the context of specific contracts.[59] As the agreements at issue in those cases

---

57Opposition at 6-7.

58Reply at 3.

59See MTD at 8-9 (citing *Capitol Records, LLC v. ReDigi, Inc.*, 934 F.Supp.2d 640, 651 (S.D.N.Y. 2013) (under the Copyright Act a "phonorecord" includes electronic file transfers);*Malmsteen v. Universal Music Grp, Inc.*, 940 F.Supp.2d 123, 127 (S.D.N.Y. 2013) (considering a contract that defined "phonograph records" as "[a]ny device now or hereafter known, on or by which sound may be recorded and reproduced, which is manufactured or distributed primarily for home and/or consumer and/or juke box use and/or use on or in means of transportation including 'sight and sound' devices or Audio–Visual Devices"); *London-Sire Records, Inc. v. Doe 1*, 542 F.Supp.2d 153, 171 (D. Mass. 2008) (the portion of a computer hard disk storing an electronic music file is a "phonorecord" within the meaning of the Copyright Act); *Allman v. Sony BMG Music Entertainment*, No. 06 CV 3252(GBD), 2008 WL 2477465, *2 (S.D.N.Y. June 18, 2008) (digital music files fall within the definition of "phonograph records" under a contract defining the term as "all forms of reproductions, now or hereafter known, manufactured or distributed primarily for home use")); Opposition at 9-10 (citing *Popovich v.*

25

provide definitions of "phonograph" that do not appear in the AFM contracts as presented to the court, and because the AFM contracts were not governed by the Copyright Act, the court finds the cases inapposite.

In Michigan, when a contract is subject to more than one reasonable interpretation, the court can admit extrinsic evidence of the parties' intentions. *Klapp v. United Ins. Group Agency*, *Inc.*, 468 Mich. 459, 469 (2003). The task of contract interpretation then becomes a question of fact. *Id.* To resolve an ambiguity, "'the fact finder must interpret the contract's terms, in light of the apparent purpose of the contract as a whole, the rules of contract construction, and extrinsic evidence of intent and meaning.'" *Id.* at 454 (quoting 11 S. Williston, LAW OF CONTRACTS § 30:7 (4th ed. 1999)). Extrinsic evidence includes "'the parties' conduct, the statements of its representatives, and past practice.'" *Id.* (quoting *Penzien v. Dielectric Prods. Eng'g Co.*, 374 Mich. 444, 449(1965)).

As noted, plaintiffs contend the phrase "[r]ecording for phonograph records only" reserved to the artists the right to exploit the recordings in non-phonographic media. UMG disputes this, citing provisions in the Artist Agreements that granted Motown an unlimited right and title in and to "phonographic records," including the right to exploit them "by any method now or hereafter known."[60] The court cannot determine if the AFM contracts contained similar language, however, as the record does not contain a complete copy of the form agreement. Moreover, in the context of a motion to dismiss, the court cannot consider extrinsic evidence that might shed light on the contracting parties' intentions.

In sum, the record is insufficient to permit the court to interpret the AFM contracts or to determine if they are ambiguous such that extrinsic evidence should be admitted to construe them.

---

*Sony Music Entertainment, Inc.* 508 F.3d 348, 356, (6th Cir. 2007) (concluding that a contract was ambiguous as to whether "records," "phonograph records," and "recordings" – defined as "all forms of reproductions, nor or hereafter known" – included CDs, where the agreement included "disc albums" but did not define this term, applying New York law).

[60]MTD at 9; SAC, Exh. B, ¶ 6.

Consequently, the court is unable to dismiss plaintiffs' claims on the basis that UMG acquired the exclusive right to exploit the recordings as phonographs and in all other media.

### E. Whether the Court Should Dismiss Plaintiffs' Unjust Enrichment Claim

"In order to sustain the claim of unjust enrichment, plaintiff must establish (1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant." *Belle Isle Grill Corp. v. City of Detroit*, 256 Mich.App.463, 478 (2003) (citing *Barber v. SMH (US), Inc.*, 202 Mich.App. 366, 375 (1993)). "If this is established, the law will imply a contract in order to prevent unjust enrichment." *Id.* (citing *Martin v. East Lansing School Dist.*,'193 Mich.App. 166, 177 (1992)). "However, a contract will be implied only if there is no express contract covering the same subject matter." *Id.* (citing *Martin*, 193 Mich.App. at 177). See also *Polaris Construction, Inc. v. Delicata*, Docket No. 308254, 2013 WL 3107537, *3 (Mich. App. June 20, 2013) (Unpub. Disp.) ("When an explicit contract does not exist, the parties' conduct, language, and other circumstances that indicate an intent to contract may give rise to an implied contract").

UMG contends that because Motown had a contract or contracts with the artists, plaintiffs' unjust enrichment claim be dismissed.[61] Plaintiffs counter that federal pleading rules permit them to plead an unjust enrichment claim in the event their contract claim is deficient.[62] Michigan state courts have held that the existence of an express contract bars an unjust enrichment claim. *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich.App. 187, 194 (2006) ("These rules, allowing simultaneous and alternative claims for breach of contract and unjust enrichment, no longer appear to be good law when both claims are asserted against the same defendant, with whom the plaintiff has an express contractual relationship"); *Belle Isle Grill Corp. v. Detroit*, 256 Mich.App. 463, 478 (2003) ("[A] contract will be implied only if there is no express contract covering the same subject matter").

---

[61]MTD at 14-15.

[62]Opposition at 19.

27

Several Michigan district courts have applied this rule to bar the simultaneous pleading of alternative claims for breach of contract and unjust enrichment where defendants do not deny the existence of a contract and both claims are asserted against the same party. See *Live Nation Worldwide, Inc. v. Hillside Productions, Inc.*, No. 10–11395, 2011 WL 1239844, *4 (E.D. Mich. Mar. 30, 2011) ("Because an express contract exists governing this matter, the unjust enrichment claim must be dismissed. Plaintiff's argument that it can alternatively plead an unjust enrichment claim is without merit because the express written contract was entered into with Defendant, which is the same Defendant in Plaintiff's unjust enrichment claim. As the Michigan Supreme Court noted above, a plaintiff may only state an alternative unjust enrichment claim if such a claim is against a different defendant from the defendant in the breach of contract claim. The unjust enrichment claim must be dismissed"); *Trinc, Inc. v. Radial Wheel, LLC*, No. 07-12488, 2009 WL 606453, *8 (E.D. Mich. Feb. 25, 2009) ("Although it would be allowable for Plaintiffs to plead their unjust enrichment count in the alternative to their breach of express contract count if the existence of an express contract were disputed by Defendants, such an alternative count cannot stand where, as is the case here, Defendants do not dispute that an express contract covering the disputed subject matter exists. As a matter of Michigan law, therefore, Plaintiffs' pre-termination claim for unjust enrichment must be dismissed"); *Advanced Plastics Corp. v. White Consol. Indus., Inc.*, 828 F.Supp. 484, 491 (E.D. Mich. 1993) ("If the parties admit that a contract exists, but dispute its terms or effect, an action will not also lie for quantum meruit or implied contract. In other words, alternative pleading of an implied contract claim is only allowed in a contract setting where a party doubts the existence of a contract") (citations omitted).

Other district courts have held that although the existence of an express contract bars a claim for unjust enrichment, under federal pleading rules, a plaintiff can simultaneously plead breach of contract and unjust enrichment claims, so long as questions of fact exist with regard to the breach of contract claim. See *Wake Plumbing and Piping, Inc. v. McShane Mechanical Contracting,* No. 12–12734, 2012 WL 6591664, *2 (E.D. Mich. Dec. 18, 2012) (rejecting the argument that plaintiff could not simultaneously plead claims for breach of contract and unjust enrichment where the existence of an express contract was not disputed, and concluding that

28

"Plaintiff may plead in the alternative because alternative pleading of unjust enrichment is appropriate when there are questions of fact regarding a contract's terms and its coverage"); *Long v. Hartley Amusements, Inc.*, No. 11–12790, 2011 WL 3799658, *3 (E.D. Mich. Aug. 26, 2011) ("Defendants next argue that because Plaintiff 'has specifically plead[ed] a written contract and invoices sent to RDI[,] Plaintiff is precluded from seeking quantum meruit relief against any defendant.' This argument is simply wrong. Under Federal Rule of Civil Procedure 8(d)(2), Plaintiff is specifically allowed to set forth alternative bases of relief, and the quantum meruit claim is explicitly pleaded in the alternative"); *Date v. Sony Electronics, Inc.*, No. 07–15474, 2010 WL 3702599, *12 (E.D. Mich. Sept. 16, 2010) (holding that plaintiffs could plead an unjust enrichment claim as an alternative to a breach of contract claim so long as there were questions of fact regarding the contract claim); *Hennigan v. General Elec. Co.*, No. 09–11912, 2010 WL 3905770, *15 (E.D. Mich. Sept. 29, 2010) ("[U]nder Fed.R.Civ.P. 8(e)(2), a party may plead a contract claim and an alternative claim for unjust enrichment"); *Truck Country of Iowa, Inc. v. R & J Truck Sales, LLC*, No. 05–71848, 2008 WL 2026141, *9 (E.D. Mich. May 9, 2008) ("[U]nder Fed.R.Civ.P. 8(e)(2) a party may plead a contract claim and an alternative claim for unjust enrichment"). But see *Groeb Farms, Inc. v. Alfred L. Wolff, Inc.*, 08–14624, 2009 WL 500816, *7 (E.D. Mich. Feb. 27, 2009) ("While it is true that Plaintiff may plead breach of contract in one count and promissory estoppel in another, it may not allege the existence of an express contract in its claim for promissory estoppel. Under paragraph thirty-four of Plaintiff's Complaint, Plaintiff specifically incorporates it prior allegations of express and valid contracts into its promissory estoppel claim. In addition, dismissal of Plaintiff's promissory estoppel on 'this basis is especially appropriate where [, as here,] the plaintiff has attached the relevant contracts to the complaint'").

Under Rule 8(d)(2) of the Federal Rules of Civil Procedure, a plaintiff may plead alternative theories of recovery. FED.R.CIV.PROC. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient"). Courts prohibiting the simultaneous pleading of unjust enrichment and

breach of contract claims do not explain why alternative pleading is prohibited as a matter of substantive Michigan law. Rather, they appear to apply a pleading rule articulated by the Michigan Courts of Appeal rather than the federal standard. The court therefore finds these cases unpersuasive, and agrees with those courts that have held that federal law permits plaintiffs simultaneously to plead unjust enrichment and breach of contract claims, even if they cannot ultimately recover on both.[63]

Here, questions of fact remain concerning the scope and enforceability of the contracts on which plaintiffs sue. Under these circumstances, the court concludes that plaintiffs can plead unjust enrichment as an alternative to their breach of contract claims. Plaintiffs allege that UMG exploited recordings created by Jamerson, Van Dyke, and Willis without authorization, and as a result has been unjustly enriched.[64] These allegations suffice to state an unjust enrichment claim.

UMG next contends that plaintiffs' unjust enrichment claim is time-barred.[65] An unjust

---

[63]This is the standard followed by district courts in the Ninth Circuit. See *Gonzalez Communications, Inc. v. Titan Wireless, Inc.*, No. 04cv147 WQH (WMc), 2007 WL 1994057, *3 n. 2 (S.D. Cal. Apr. 18, 2007) ("The Court deems the unjust enrichment counterclaim to be pleaded in the alternative to the breach of contract and breach of the implied covenant of good faith and fair dealing counterclaims"); *In re Wal-Mart Wage and Hour Employment Practices Litig.*, 490 F.Supp.2d 1091, 1117 (D. Nev. 2007) ("Even if Plaintiff had alleged an express contract, Plaintiff may plead alternative, inconsistent theories [pursuant to Rule 8(d)]. . . . The liberal policy reflected in Rule 8[d](2) instructs courts not to construe a pleading '"as an admission against another alternative or inconsistent pleading in the same case,"' quoting *McCalden v. Cal. Library Ass'n*, 955 F.2d 1214, 1219 (9th Cir. 1990) (in turn quoting *Molsbergen v. United States*, 757 F.2d 1016, 1019 (9th Cir. 1985)); *In re HP Inkjet Printer Litig.*, No. C 05-3580 JF, 2006 WL 563048, *7 (N.D. Cal. Mar. 7, 2006) ("[A]lthough the terms of HP's written warranty agreements may govern the relationship between HP and Plaintiffs, Plaintiffs may plead an unjust enrichment claim in the alternative"); see also *E.H. Boly & Son, Inc. v. Schneider*, 525 F.2d 20, 23 n. 3 (9th Cir. 1975) (although a plaintiff cannot recover on both theories, "a plaintiff may claim . . . remedies as alternatives, leaving the ultimate election for the court"); *Hubbard Bus. Plaza v. Lincoln Liberty Life Ins. Co.*, 596 F.Supp. 344, 347 (D. Nev. 1984) (stating that a "claimant is entitled to introduce his evidence in support of all his claims for relief; if he doesn't make an election among them, the trier of fact decides which, if any, to sustain").

[64]SAC, ¶¶ 63-64; Willis Complaint, ¶¶ 22-23.

[65]MTD at 15.

enrichment claim is the equitable counterpart of a legal claim for breach of contract. *Romeo Inv. Ltd.*, 2007 WL 1264008 at *8; *Keywell & Rosenfeld v. Bithell*, 254 Mich.App. 300, 328 (2002). Statutes of limitation apply by analogy to equitable claims. *Romeo Inv. Ltd.*, 2007 WL 1264008 at *8; see *Taxpayers Allied for Constitutional Taxation v. Wayne Co.*, 450 Mich. 119, 127 n. 9 (1995) ("If legal limitations periods did not apply to analogous equitable suits, 'a plaintiff [could] dodge the bar set up by a limitations statute simply by resorting to an alternate form of relief provided by equity'"). "Thus, when an equitable claim would provide relief that is analogous to the relief available under a similar legal claim, courts typically apply the legal claim's statute of limitations to the equitable claim as well." *Huhtala v. Travelers Ins Co.*, 401 Mich. 118, 125 (1977) ("We are of the opinion that the time for bringing an action for promissory estoppel is governed by the contract statute of limitations, six years, and that plaintiffs' action was therefore timely commenced"); *Romeo Inv. Ltd.*, 2007 WL 1264008 at *8 ("We choose to apply the same six-year period of limitations to the unjust enrichment claim as that applicable to plaintiff's breach of contract claim"). Because it has denied UMG's motion to dismiss plaintiffs' breach of contract claims as time-barred, the court similarly denies UMG's motion to dismiss plaintiffs' unjust enrichment claim as time-barred.

**F.      Whether the Court Should Dismiss Plaintiffs' Unfair Competition Claim Under Michigan Law**

Under Michigan common law, a party is prohibited from engaging in unfair and unethical trade practices that are harmful to his or her competitors or to the general public. *Dana Ltd. v. American Axle and Mfg. Holdings, Inc.*, No. 1:10–CV–450, 2011 WL 4954061, *3 (W.D. Mich. Oct. 17, 2011); *Veterans Medical Products, Inc. v. Bionix Development Corp.*, No. 1:05–cv–655, 2009 WL 891724, *7 (W.D. Mich. Mar. 31, 2009) ("The gist of an unfair competition case is that the public is so misled that the plaintiff loses some trade by reason of the defendant's deception"); *Atco Industries, Inc.*, 2003 WL 21582962 at *3 ("Michigan's common law of unfair competition prohibits unfair and unethical trade practices that are harmful to one's competitors or to the general public. . . . The term unfair competition may encompass any conduct that is fraudulent or deceptive and tends to mislead the public").

31

UMG argues that plaintiffs' Michigan unfair competition claim must be dismissed because plaintiffs do not allege they were or are in competition with Motown.[66] Michigan courts generally require that a plaintiff alleging a claim for unfair competition be in competition with the defendant. *Veterans Medical Products, Inc.*, 2011 WL 4954061 at *9 ("An unfair competition claim in Michigan, however, does require that the plaintiff be in competition with the defendant"); *Carson Real Estate Cos., LLC v. Constar Group, Inc.*, No. 10–CV–13966, 2011 WL 4360017, *6 (E.D. Mich. Sept. 19, 2011) ("This Court agrees that Michigan law generally requires that the parties be in competition in order to state a claim for unfair competition"); *Burns v. Schotz*, 343 Mich. 153, 157 (1955) ("[I]n order to prove unfair competition there must be actual competition shown from specific instances or as a natural tendency of defendant's act," citing *Good Housekeeping Shop v. Smitter*, 254 Mich. 592, 596 (1931)); *Boron Oil Company v. Callanan*, 50 Mich.App. 580, 583 (1973) ("[O]ne simply cannot be found guilty of unfair competition when the facts indicate no competition"). See *Passalacqua Corp. v. Restaurant Management II, Inc.*, 885 F.Supp.154, 156 (E.D. Mich. Mar. 29, 1995) ("There are numerous Michigan cases, like the one presently before this court, in which the Michigan Supreme Court relied solely upon the state law common law doctrine of unfair competition to analyze claims brought to enjoin a competitor from selling similar services or goods under a nearly identical name"). Here, plaintiffs do not allege that they (or their decedents) were or are in competition with Motown or UMG. Plaintiffs argue that they are unable to compete with Motown because it is misappropriating the product they would be able to sell.[67] Plaintiffs allege no facts, however,

---

[66]*Id.*

[67]Opposition at 20.

demonstrating an intention to compete with UMG. Accordingly, their common law unfair competition law must be dismissed.[68]

### G. Whether the Court Should Dismiss Plaintiffs' Claims for Violation of California Business & Professions Code § 17200 ("UCL") and California Common Law Unfair Competition

UMG next moves to dismiss plaintiffs' statutory and common law unfair competition claims under California law.[69] As an initial matter, the court has already determined that Michigan law, not California law, governs this case. This includes plaintiffs' UCL and California common law unfair competition claims, because the factual allegations supporting these claims concern UMG's alleged breach of Motown's contracts with the artists.[70] See *Audio Marketing Servs.*, 2013 WL 633202 at *2 ("A 'valid choice-of-law clause, which provides that a specified body of law 'governs' the 'agreement' between the parties, encompasses all causes of action arising from or related to that agreement, regardless how they are characterized, including tortious breaches of duties emanating from the agreement or the legal relationships it creates"). Consequently, plaintiffs' claims for violation of the California UCL and California common law unfair competition must be dismissed for this reason alone. See *Cannon v. Wells Fargo Bank N.A.*, 917 F.Supp.2d 1025, 1051, 1055 (N.D. Cal. Jan. 9, 2013) (enforcing a contractual choice-of-law clause requiring application of "the law of the jurisdiction in which the Property is located," which was Florida, and dismissing a § 17200 claim because Florida law, and not California law, governed the case). See also *CollegeNet, Inc. v. Xap Corp.*, No. CV–03–1229–HU, 2004 WL 2303506, *14 (D. Or. Oct. 12, 2004) ("Plaintiff contends that even if the unfair competitions claims are not preempted or precluded, the California statutory claim should be dismissed because

---

[68]Although plaintiffs allege their common law unfair competition claim under Michigan law, they discuss California law in their opposition. (*Id.* at 20.) UMG argues the claim is time-barred under Michigan's six-year statute of limitations. For reasons previously discussed, the court declines to dismiss plaintiffs' common law unfair competition claim on this basis.

[69]*Id.* at 16.

[70]SAC, ¶ 66.

33

California law does not apply to plaintiff's Oregon conduct. I agree with plaintiff").

"The UCL prohibits 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.'" *Stearns v. Select Comfort Retail Corp.*, No. 08-2746 JF (PVT), 2010 WL 2898284 *16 (N.D. Cal. July 21, 2010) (quoting CAL. BUS. & PROF. CODE § 17200). "'An act can be alleged to violate any or all of the three prongs of the UCL – unlawful, unfair, or fraudulent.'" *Id.* (quoting *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal.App.4th 1544, 1554 (2007)). The law is "sweeping, embracing anything that can properly be called a business practice and [that is] at the same time is forbidden by law." *Cel-Tech Communications, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999); *Palestini v. Homecomings Fin., LLC*, No. 10CV1049-MMA, 2010 WL 3339459, *9 (S.D. Cal. Aug. 23, 2010) (same).

UMG argues that plaintiffs' § 17200 claim must be dismissed because they allege only extraterritorial misconduct.[71] Plaintiffs counter that they allege some of the songs for which royalties are owed were written or recorded in California, and assert a § 17200 claim only with respect to those works.[72] UMG contends the issue is not where the work for which royalties are allegedly due was performed, but where plaintiffs allegedly suffered harm, i.e., where they reside.[73] Section 17200 is not "applicable to claims of non-California residents injured by conduct occurring beyond California's borders." *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal.App.4th 214, 222 (1999); see also *Badella v. Denior Marketing LLC*, No. C 10–03908 CRB, 2011 WL 5358400, *11 (N.D. Cal. Nov. 4, 2011) ("[T]he Court recognizes that extraterritorial application of the UCL is improper where non-residents of California raise claims based on conduct that allegedly occurred outside of the state," citing *Sullivan v. Oracle Corp.*, 547 F.3d 1117, 1187 (9th Cir. 2008)). Although plaintiffs allege that some of the recordings were made in California, it is not the recordings about which they complain. Rather, it is UMG's exploitation

---

[71]MTD at 16.

[72]Opposition at 22. See SAC, ¶ 7.

[73]Reply at 13.

34

of the recordings and its  purported failure to pay plaintiffs royalties.  Plaintiffs do not allege that any of these activities took place in California.  Absent such allegations, the court cannot conclude that it is appropriate to apply the UCL to the claims of non-California residents such as plaintiffs. This provides an alternative basis on which to dismiss plaintiffs' UCL claim.[74]

UMG finally contends that plaintiffs' claim under California common law fails because they have not alleged a competitive injury.[75]  Plaintiffs do not respond to this argument.  Accordingly, the court deems their California common law unfair competition claim abandoned and dismisses the claim.  See *Qureshi v. Countrywide Home Loans, Inc*., No. 09–4198, 2010 WL 841669, *6 n. 2 (N.D. Cal. Mar. 10, 2010) (deeming plaintiff's failure to address, in his opposition, claims challenged in a motion to dismiss an "abandonment of those claims").

### H.     Whether the Court Should Dismiss Plaintiffs' Claim for an Accounting

UMG moves finally to dismiss plaintiffs' accounting claim under Michigan law.[76]  It is unclear whether plaintiffs' argument concerning an "open account" claim was intended as a response to UMG's motion to dismiss the accounting claim, as they do not otherwise respond. The court must dismiss the claim, either because plaintiffs' argument regarding an open account claim is unavailing, or because plaintiffs did not respond to UMG's request for dismissal and thus abandoned the claim.  See *Qureshi*, 2010 WL 841669, *6 n. 2.

### III.  CONCLUSION

For the reasons stated, the court grants UMG's motion to dismiss plaintiffs' California UCL and common law unfair competition claims, their Michigan unfair competition claim, and their claim for an accounting under Michigan law.  Because plaintiffs abandoned their California

---

[74]Because the court dismisses plaintiffs' UCL claim on two independent bases, it need not address UMG's argument that the claim must be dismissed because plaintiffs have failed to allege "unlawful," "unfair," or "fraudulent" conduct.  (MTD at 17.)

[75]MTD at 17.

[76]*Id.* at 18.

common law unfair competition claim, the court dismisses that claim with prejudice. See *Westley v. Oclaro, Inc.*, No. C–11–2448 EMC, 2013 WL 2384244, *11 (N.D. Cal. May 30, 2013) ("The claims against Mr. Haynes shall be dismissed with prejudice on the basis that Plaintiffs waived or abandoned the claims"); *In re Facebook Privacy Litigation*, No. C 10–02389 JW, 2011 WL 6176208, *2 n. 5 (N.D. Cal. Nov. 22, 2011) ("Plaintiffs' Opposition does not address either the Wiretap Act cause of action or Defendant's Motion to Dismiss as to that cause of action. . . . [T]he Court concludes that Plaintiffs have abandoned their Wiretap Act cause of action, which is therefore dismissed with prejudice"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F.Supp.2d 1109, 1131 (N.D. Cal. 2008) (granting a motion to dismiss a claim without leave to amend after noting that plaintiffs' opposition did not address defendants' arguments regarding the claim, and that plaintiffs had therefore abandoned the claim). The court also dismisses plaintiff's California UCL claim with prejudice, because Michigan law governs this case. All other claims are dismissed without prejudice. The court denies UMG's motion to dismiss plaintiffs' breach of contract claims and their unjust enrichment claim under Michigan law. Plaintiffs may file an amended complaint within twenty days of the date of this order. No new claims or parties may be added to the amended complaint.

DATED: April 14, 2014

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE